**KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.**
Gary S. Graifman
210 Summit Avenue
Montvale, New Jersey 07645
Telephone:    (201) 391-7000
ggraifman@kgglaw.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DAVID ROSENBERG, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. |
| Plaintiff, | |
| vs. | CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| ALLERGAN PLC (f/k/a ACTAVIS PLC), BRENTON L. SAUNDERS, PAUL M. BISARO, MARIA TERESA HILADO and ROBERT TODD JOYCE, | |
| Defendants. | DEMAND FOR JURY TRIAL |

Plaintiff David Rosenberg ("Plaintiff"), on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Allergan plc (formerly known as Actavis plc) ("Allergan" or the "Company"), as well as conference call transcripts and media and analyst reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

- 1 -

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of Allergan common stock between February 25, 2014 and November 2, 2016, inclusive (the "Class Period"). Plaintiff seeks to pursue remedies against Allergan and certain of its most senior executives under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule l0b-5 promulgated thereunder.

2.      Defendant Allergan is a Dublin, Ireland-based specialty pharmaceutical company that develops, manufactures, markets, and distributes medical aesthetics, biosimilar, and over-the-counter pharmaceutical products worldwide.

3.      The Company, formerly known as Actavis plc, changed its name to Allergan plc in June 2015 when its predecessor acquired then California-based Allergan Inc. Prior to June 15, 2015, the common stock of Actavis plc traded on the New York Stock Exchange ("NYSE") under the ticker symbol "ACT." Allergan now has more than 375 million shares of common stock issued and outstanding that trade on the NYSE under the ticker symbol "AGN."

4.      Throughout the Class Period, the Company generally reported growing revenues, turning its losses into profits.

5.      Meanwhile, based on these and other additional positive but false statements defendants made during the Class Period, Allergan common stock traded at fraud-inflated levels, reaching a Class Period high of more than $340 per share in intraday trading on July 29, 2015. With the price of Allergan common stock artificially inflated, the Company completed the acquisition of Allergan Inc. in a cash and equity transaction valued at approximately $70.5 billion.

6.      On August 6, 2015, Allergan disclosed that, "[o]n June 25, 2015, the Company [had] received a subpoena from the U.S. Department of Justice ("DOJ"), Antitrust Division, seeking information relating to the marketing and pricing of certain of the Company's generic products and

- 2 -

communications with competitors about such products." That same evening, *Bloomberg* published a report emphasizing that while several other companies had "made similar disclosures in the past several months," Allergan was "the biggest company yet to draw scrutiny in the government's widening antitrust probe of the industry."

7.      On this news, the price of Allergan common stock declined $17.17 per share on August 6, 2015, down approximately 5% from its prior close, on unusually high trading volume of nearly four million shares.

8.      Thereafter, during the trading day on November 3, 2016, several media outlets reported that, by the end of 2016, U.S. prosecutors were likely to file criminal charges against Allergan and several other pharmaceutical companies for unlawfully colluding to fix generic drug prices.

9.      On this news, the price of Allergan common stock plummeted more than $9 per share on November 3, 2016, or more than 4.5%, on unusually heavy trading of more than 13 million shares, ***erasing more than $56 billion in market capitalization worldwide from the stock's Class Period High***.

## JURISDICTION AND VENUE

10.      Jurisdiction is conferred by §27 of the Exchange Act.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

11.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as many of the false and misleading statements alleged herein were disseminated in this District.  Allergan also does substantial business in this District, and its administrative headquarters are located in this District.

12.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

13.     Plaintiff David Rosenberg, as set forth in the accompanying Certification, Exhibit A, which is incorporated by reference herein, purchased Allergan common stock during the Class Period and has been damaged thereby.

14.     Defendant Allergan is a Dublin, Ireland-based specialty pharmaceuticals manufacturer. The Company's U.S. Administrative Headquarters are located at Morris Corporate Center III, Four Hundred Interpace Parkway, Parsippany, New Jersey 07054. As of October 26, 2016, the Company had more than 375 million shares of common stock issued and outstanding, which trade on the NYSE under the ticker symbol "AGN."

15.     Defendant Brenton L. Saunders ("Saunders") is, and has been since July 2014, the Chief Executive Officer ("CEO") and President of Allergan.

16.     Defendant Paul M. Bisaro ("Bisaro") served as Allergan's CEO and President between September 2007 and July 2014.

17.     Defendant Maria Teresa Hilado ("Hilado") is, and has been since December 2014, the Chief Financial Officer ("CFO") of Allergan.

18.     Defendant Robert Todd Joyce ("Joyce") served as Allergan's CFO between October 2009 and December 2014.

19.     Defendants Saunders, Bisaro, Hilado and Joyce are referred to herein as the "Individual Defendants." Allergan and the Individual Defendants are referred to herein, collectively, as "Defendants."

- 4 -

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of Allergan during the Class Period (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

21.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Allergan common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Allergan and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

22.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

23.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

24.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        (a)     whether the Exchange Act was violated by Defendants as alleged herein;

(b)    whether statements made by Defendants misrepresented material facts about the business, operations and management of Allergan; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

25.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

26.    Founded in 1983, Dublin, Ireland-based Allergan was formerly known as Actavis PLC. Allergan is a specialty pharmaceutical company that develops, manufactures, markets, and distributes medical aesthetics, biosimilar, and over-the-counter pharmaceutical products worldwide. Allergan has operations in more than 100 countries.

27.    The Class Period starts on February 25, 2014. On that day, the Company filed its fiscal 2013 financial report with the SEC for the fourth quarter and fiscal year ended December 31, 2013 on Form 10-K (the "2013 10-K"). The 2013 10-K was signed and certified pursuant to the Sarbanes Oxley Act of 2002 ("SOX") by Defendants Bisaro and Joyce. For the 2013 fourth quarter, Allergan reported a net loss of $148.40 million, or $0.86 per diluted share, on revenue of $2.78 billion, compared to net income of $28.00 million, or $0.21 per diluted share, on revenue of $1.75 billion for the same period in the prior year. For fiscal 2013, Allergan reported a net loss of $750.40 million, or $5.27 per diluted share, on revenue of $8.68 billion, compared to net income of $97.30 million, or $0.76 per diluted share, on revenue of $5.91 billion for fiscal 2012. Concerning the

- 6 -

Company's business model and compliance with the federal antitrust laws, the 2013 10-K stated, in

pertinent part, as follows:

**Competition**

*The pharmaceutical industry is highly competitive.* In our Actavis Pharma and
Actavis Specialty Brands businesses, *we compete with different companies*
depending upon product categories, and within each product category, upon dosage
strengths and drug delivery systems. Such competitors include the major brand name
and generic manufacturers of pharmaceutical products. *In addition to product
development, other competitive factors in the pharmaceutical industry include
product quality and price, reputation and service and access to proprietary and
technical information.*

\*        \*        \*

*We actively compete in the generic pharmaceutical industry. Revenues and gross
profit derived from the sales of generic pharmaceutical products tend to follow a
pattern based on certain regulatory and competitive factors.* As patents and
regulatory exclusivity for brand name products expire or are successfully challenged,
the first off-patent manufacturer to receive regulatory approval for generic
equivalents of such products is generally able to achieve significant market
penetration. *As competing off-patent manufacturers receive regulatory approvals
on similar products, market share, revenues and gross profit typically decline, in
some cases dramatically.* Accordingly, the level of market share, revenues and gross
profit attributable to a particular generic product *normally is related to the number
of competitors in that product's market pricing and the timing of that product's
regulatory approval and launch, in relation to competing approvals and launches.
Consequently, we must continue to develop and introduce new products in a timely
and cost-effective manner to maintain our revenues and gross profit. In addition to
competition from other generic drug manufacturers, we face competition from
brand name companies in the generic market.* Many of these companies seek to
participate in sales of generic products by, among other things, collaborating with
other generic pharmaceutical companies or by marketing their own generic
equivalent to their brand products as Authorized Generics. Our major competitors
include Teva Pharmaceutical Industries, Ltd., Mylan Inc. and Sandoz, Inc. (a division
of Novartis AG). . . . *The pharmaceutical industry is highly competitive and our
future revenue growth and profitability are dependent on our timely development
and launches of new products ahead of our competitors.* . . .

Competing in the brand product business requires us to identify and bring to market
new products embodying technological innovations. *Successful marketing of brand
products depends primarily on the ability to communicate their effectiveness, safety
and value to healthcare professionals in private practice, group practices and
receive formulary status from managed care organizations.*

\*        \*        \*

In our Anda Distribution business, *we compete with a number of large wholesalers and other distributors of pharmaceuticals*. . . .

28.       The 2013 10-K also purported to describe the Company's then-present business strategy, stating, in pertinent part, as follows:

**Business Strategy**

We apply three key strategies to achieve growth for our Actavis Pharma and Actavis Specialty Brands pharmaceutical businesses: (i) internal development of differentiated and high-demand products, including, in certain circumstances, challenging patents associated with these products, (ii) establishment of strategic alliances and collaborations and (iii) acquisition of products and companies that complement our current business.

\*        \*        \*

*We believe that we are able to effectively compete in the distribution market, and therefore optimize our market share, based on three critical elements: (i) competitive pricing, (ii) high levels of inventory for approximately 12,725 SKUs for responsive customer service that includes, among other things, next day delivery to the entire U.S., and (iii) well established telemarketing relationships with our customers, supplemented by our electronic ordering capabilities.*

29.       On April 30, 2014, Allergan issued a press release announcing its financial and operating results for the quarter ended March 31, 2014 (the "Q1 2014"). For the Q1 2014, Allergan reported net income of $96.50 million, or $0.55 per diluted share, on revenue of $2.66 billion, compared to a net loss of $102.80 million, or $0.79 per diluted share, on revenue of $1.90 billion for the same period in the prior year. The release quoted Defendant Bisaro stating, in pertinent part, as follows:

Overall revenue growth of 36 percent in our commercial pharmaceutical business *benefitted from the continued strength of our generics business*, resulting from the launch of our generic Micardis® in the U.S. and continued strong sales of the generic versions of Lidoderm® and Cymbalta®.

\*        \*        \*

- 8 -

Along with solid performance that exceeded our forecast, *we continued to focus on future growth drivers through investment in R&D across the business, and within the U.S. generic business*. . . .

30.     On May 5, 2014, Allergan filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q1 2014 release and reporting in full the Company's financial and operating results for the quarter ended March 31, 2014 (the "Q1 2014 10-Q"). The Q1 2014 10-Q was signed and certified pursuant to SOX by Defendants Bisaro and Joyce.

31.     On August 5, 2014, Allergan issued a release announcing the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014"). For the quarter, Allergan reported net income of $48.70 million, or $0.28 per diluted share, on revenue of $2.70 billion, compared to a net loss of $564.80 million, or $4.27 per diluted share, on revenue of $1.99 billion for the same period in the prior year. The release quoted Defendant Bisaro stating, in pertinent part, as follows:

Our exceptional performance during the second quarter *resulted from double digit revenue growth* in both our North American brand and generics businesses and Anda Distribution. . . .

Overall revenue growth of 31 percent in our commercial pharmaceutical business *was supported by our North American Brands business*, which benefitted from the expanded portfolio resulting from the acquisition of Warner Chilcott in October 2013, *as well as continued strong sales of core products in the U.S.* We also saw strong growth within our generics business, *powered by our strong base business along with continued strong sales*. . . .

32.     On August 5, 2014, Allergan filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q2 2014 release and reporting in full the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 10-Q"). The Q2 2014 10-Q was signed and certified pursuant to SOX by Defendants Saunders and Joyce.

- 9 -

33.    On November 5, 2014, Allergan issued a release announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014"). For the quarter, Allergan reported a net loss of $1.04 billion, or $3.95 per diluted share, on revenue of $3.70 billion, compared to net income of $65.60 million, or $0.49 per diluted share, on revenue of $2.00 billion for the same period in the prior year. The release quoted Defendant Saunders stating, in pertinent part, as follows:

> Our 53 percent year-over-year growth in non-GAAP EPS *reflects the strong contributions of our new brand pharmaceutical portfolios*, resulting from the acquisitions of Warner Chilcott and Forest, *as well as the continued strong performance of our U.S. Generics and International businesses and the Anda Distribution business . . . [.]* During the quarter, our North American Brands business *was driven by strong sales* from key products including our Namenda® products, Bystolic®, Linzess®, Lo Loestrin® Fe, Estrace® Cream, Daliresp® and Tudorza™. . . . Within our North American Generics business, *we capitalized on continued strength across the business*. . . .
>
> When I outlined our roadmap for accelerated growth last quarter, we committed to driving balanced performance across brands and generics, retaining our commitment to invest in organic growth and accelerating integration and synergy capture. *We can report substantial progress across the board.*

34.    On November 5, 2014, Allergan filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q3 2014 release and reporting in full the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 10-Q"). The Q3 2014 10-Q was signed and certified pursuant to SOX by Defendants Saunders and Joyce.

35.    In November 2014, the Company announced its intention to acquire California-based Allergan Inc.

36.    On February 18, 2015, Allergan issued a press release announcing the Company's financial and operating results for the fourth quarter and fiscal year ended December 31, 2014. For the 2014 fourth quarter, Allergan reported a net loss of $732.90 million, or $3.34 per diluted share,

on revenue of $2.42 billion, compared to a net loss of $148.40 million, or $0.86 per diluted share, on

revenue of $2.78 billion for the same period in the prior year. For fiscal 2014, Allergan reported a

net loss of $1.63 billion, or $7.42 per diluted share, on revenue of $6.74 billion, compared to a net

loss of $750.40 million, or $5.27 per diluted share, on revenue of $8.68 billion for fiscal 2013. The

release quoted Defendant Saunders stating in pertinent part as follows:

> Our fourth quarter results ***demonstrate our laser-like commitment to drive strong
> growth and sustainable value creation across our businesses***, while simultaneously
> executing transformative business development initiatives . . . . ***We continue to
> invest in expanding our brand and generic portfolios***. . . .

37.    On February 18, 2015, Allergan filed its annual financial report on Form 10-K with

the SEC, reiterating the financial and operating results previously announced in the fourth quarter

and fiscal 2014 release and reporting in full the Company's financial and operating results for the

quarter and fiscal year ended December 30, 2014 (the "2014 10-K"). The 2014 10-K was signed and

certified pursuant to SOX by Defendants Saunders and Hilado. Concerning the Company's business

model and compliance with the federal antitrust laws, the 2014 10-K stated, in pertinent part, as

follows:

> **Competition**
>
> **The pharmaceutical industry is highly competitive**. In our North American
> Brands and North American Generics and International businesses, ***we compete with
> different companies depending upon product categories, and within each product
> category, upon dosage strengths and drug delivery systems***. Such competitors
> include the major brand name and generic manufacturers of pharmaceutical products.
> In addition to product development, ***other competitive factors in the pharmaceutical
> industry include product quality, price, reputation, service and access to
> proprietary and technical information***.
>
> *    *    *
>
> ***Competing in the brand product business requires us to identify and bring to
> market new products embodying technological innovations***. Successful marketing
> of brand products ***depends primarily on the ability to communicate their
> effectiveness, safety and value to healthcare professionals in private practice,
> group practices and receive formulary status from managed care organizations***.

We anticipate that our brand product offerings will support our existing areas of therapeutic focus. Based upon business conditions and other factors, we regularly reevaluate our business strategies and may from time to time reallocate our resources from one therapeutic area to another, withdraw from a therapeutic area or add an additional therapeutic area in order to maximize our overall growth opportunities. *Our competitors in brand products include major brand name manufacturers of pharmaceuticals.*

\*     \*     \*

*We actively compete in the generic pharmaceutical industry.* Revenues and gross profit derived from the sales of generic pharmaceutical products *tend to follow a pattern based on certain regulatory and competitive factors*. As patents and regulatory exclusivity for brand name products expire or are successfully challenged, the first off-patent manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration. As competing off-patent manufacturers receive regulatory approvals on similar products, market share, revenues and gross profit typically decline, in some cases dramatically. *Accordingly, the level of market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market, pricing and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches.* Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross profit. *In addition to competition from other generic drug manufacturers, we face competition from brand name companies in the generic market.* Many of these companies seek to participate in sales of generic products by, among other things, collaborating with other generic pharmaceutical companies or by marketing their own generic equivalent to their brand products as "Authorized Generics". Our major competitors include Teva Pharmaceutical Industries, Ltd., Mylan Inc. and Sandoz, Inc. (a division of Novartis AG). . . . *The pharmaceutical industry is highly competitive and our future revenue growth and profitability are dependent on our timely development and launches of new products ahead of our competitors*. . . .

In our Anda Distribution segment, *we compete with a number of large wholesalers and other distributors of pharmaceuticals*. . . .

38. The 2014 10-K also purported to describe the Company's then-present business

strategy, stating, in pertinent part, as follows:

**Business Strategy**

We apply three key strategies to achieve growth for our North American Brands and North American Generics and International businesses: (i) internal development of differentiated and high-demand products, including, in certain circumstances as it relates to generics, challenging patents associated with these products, (ii)

establishment of strategic alliances and collaborations and (iii) acquisition of products and companies that complement our current business.

*       *       *

*We believe that we are able to effectively compete in the distribution market, and therefore optimize our market share, based on three critical elements: (i) competitive pricing, (ii) high levels of inventory for approximately 12,650 SKUs for responsive customer service that includes, among other things, next day delivery to the entire U.S., and (iii) well-established telemarketing relationships with our customers, supplemented by our electronic ordering capabilities.*

39.    In March 2015, the Company completed its acquisition of Allergan Inc. and changed its name to Allergan PLC in June 2015.

40.    On May 11, 2015, Allergan issued a press release announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015"). For the quarter, Allergan reported a net loss of $512.00 million, or $1.85 per diluted share, on revenue of $2.56 million, compared to net income of $96.50 million, or $0.55 per diluted share, on revenue of $2.66 billion for the same period in the prior year. The release quoted Defendant Saunders stating, in pertinent part, as follows:

*Our first quarter performance was highlighted by strong revenue growth* from Namenda XR®, Linzess®, Bystolic®, Viibryd®/ Fetzima®, LoLoestrin® Fe, Saphris®, Estrace® Cream as well *as continued growth within our generics business, powered by strong sales* of the generic versions of Concerta®, Intuniv® and the recent launch of our generic version of OxyContin®.

41.    On May 11, 2015, Allergan filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q1 2015 release and reporting in full the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q"). The Q1 2015 10-Q was signed and certified pursuant to SOX by Defendants Saunders and Hilado.

42.    On July 26, 2015, Allergan entered into a master purchase agreement, under which Teva Pharmaceutical Industries Ltd. ("Teva") agreed to acquire the Company's Actavis global generic pharmaceuticals business unit.

43.    On August 2, 2016, Allergan and Teva announced the completion of the acquisition of the Company's Actavis global generic pharmaceuticals business by Teva.

44.    On August 6, 2015, Allergan issued a press release announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015"). For the quarter, Allergan reported a net loss of $243.10 million, or $0.80 per diluted share, on revenue of $3.63 billion, compared to net income of $48.70 million, or $0.28 per diluted share, on revenue of $2.67 billion for the same period in the prior year. The Q1 2015 release quoted Defendant Saunders stating, in pertinent part, as follows:

> In our first full quarter as a combined Company, Allergan delivered exceptional results. ***Our performance was powered by operational excellence and double-digit growth across our Brands and Global Generics businesses, while continuing outstanding momentum on the integration of Actavis and Allergan.*** We also achieved important R&D milestones that will help fuel both our branded and generics businesses in the future[.]
>
> *              *              *
>
> Allergan also recently made the bold decision to divest its generics business to Teva and to streamline its operations with laser sharp focus on its future as a branded Growth Pharma leader.

45.    On August 6, 2015, Allergan filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q2 2015 release and reporting in full the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q"). The Q2 2015 10-Q was signed and certified pursuant to SOX by Defendants Saunders and Hilado.

- 14 -

46.     On November 4, 2015, Allergan issued a press release announcing the Company's

financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015"). For the

quarter, Allergan reported net income of $5.30 billion, or $13.29 per diluted share, on revenue of

$3.47 billion, compared to a net loss of $1.04 billion, or $3.95 per diluted share, on revenue of $2.15

billion for the same period in the prior year.  The Q3 2015 release quoted Defendant Saunders

stating, in pertinent part, as follows:

> Allergan delivered exceptional performance across the board in the third quarter that
> exceeded expectations. ***These strong results were driven by our continued focus on
> customers***, fueling volume-driven year-over-year growth in our U.S. Brands,
> Medical Aesthetics, International Brands and Anda Distribution segments, while also
> executing pre-integration activities ahead of the divestiture of the Generics business
> to Teva, which remains on track to be completed in the first quarter of 2016.

47.     On November 6, 2015, Allergan filed a Quarterly Report on Form 10-Q with the

SEC, reiterating the financial and operating results previously announced in the Q3 2015 release and

reporting in full the Company's financial and operating results for the quarter ended September 30,

2015 (the "Q3 2015 10-Q").  The Q3 2015 10-Q was signed and certified pursuant to SOX by

Defendants Saunders and Hilado.

48.     On February 22, 2016, Allergan issued a press release announcing the Company's

financial and operating results for the fourth quarter and fiscal year ended December 31, 2015.  For

the fourth quarter, Allergan reported a net loss of $630.90 million, or $1.78 per diluted share, on

revenue of $4.20 billion, compared to a net loss of $732.90 million, or $3.34 per diluted share, on

revenue of $2.42 billion for the same period in the prior year.  For fiscal 2015, Allergan reported net

income of $3.92 billion, or $10.01 per diluted share, on revenue of $15.07 billion, compared to a net

loss of $1.63 billion, or $7.42 per diluted share, on revenue of $6.74 billion for fiscal 2014.  The

fourth quarter and fiscal 2014 release also stated, in pertinent part, as follows:

> As a result of the announced proposed divestiture of Allergan's Global Generics
> business to Teva on July 27, 2015, the financial results of the Company's Global

- 15 -

Generics business are being reported as discontinued operations in the condensed consolidated statements of operations beginning with the third quarter 2015. These portions of the Company's results will continue to be reported as discontinued operations until the close of that transaction. The Global Generics business delivered solid performance during the fourth quarter. Continuing operations includes the U.S. Brands, U.S. Medical, International Brands and Anda Distribution segments. All prior year results have been recast to reflect continuing operations results.

49.     The release also quoted Defendant Saunders stating, in pertinent part, as follows:

We have also made important progress with Teva on the planned divestiture of our Global Generics business. And in November, Pfizer and Allergan announced the proposed combination of the two companies. This bold step brings together the best strengths of both companies – adding Allergan's leading products across seven therapeutic areas and robust mid-to-late stage R&D pipeline to Pfizer's leading innovative and established businesses, vast worldwide commercial operations and discovery R&D leadership to create a new biopharma leader.

50.     On February 26, 2016, Allergan filed its annual financial report on Form 10-K with

the SEC, reiterating the financial and operating results previously announced in the fourth quarter

and fiscal 2015 release and reporting in full the Company's financial and operating results for the

quarter and fiscal year ended December 31, 2015 (the "2015 10-K"). The 2015 10-K was signed and

certified pursuant to SOX by Defendants Saunders and Hilado. Concerning the Company's business

model and compliance with the federal antitrust laws, the 2015 10-K stated, in pertinent part, as

follows:

### Competition

*The pharmaceutical industry is highly competitive.* In our US Brands, US Medical Aesthetics and International Brands businesses, *we compete with different companies depending upon product categories, and within each product category, upon dosage strengths and drug delivery systems*. Such competitors include the major brand name manufacturers of pharmaceutical products. In addition to product development, *other competitive factors in the pharmaceutical industry include product quality, price, reputation, service and access to proprietary and technical information*.

\*       \*       \*

*Competing in the brand product business requires us to identify and bring to market new products embodying technological innovations. Successful marketing*

*of brand products depends primarily on the ability to communicate their effectiveness, safety and value to healthcare professionals in private practice, group practices and receive formulary status from managed care organizations.* We anticipate that our brand product offerings will support our existing areas of therapeutic focus. Based upon business conditions and other factors, we regularly reevaluate our business strategies and may from time to time reallocate our resources from one therapeutic area to another, withdraw from a therapeutic area or add an additional therapeutic area in order to maximize our overall growth opportunities. *Our competitors in brand products include major brand name manufacturers of pharmaceuticals.* . . .

*   *   *

In our Anda Distribution segment, *we compete with a number of large wholesalers and other distributors of pharmaceuticals.*

*   *   *

As a result of the Teva Transaction, the Company's global generics business is classified as discontinued operations. *Our discontinued operations actively competes in the generic pharmaceutical industry.* Revenues and gross profit derived from the sales of generic pharmaceutical products *tend to follow a pattern based on certain regulatory and competitive factors.* As patents and regulatory exclusivity for brand name products expire or are successfully challenged, the first off-patent manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration. As competing off-patent manufacturers receive regulatory approvals on similar products, market share, revenues and gross profit typically decline, in some cases dramatically.

Accordingly, the level of market share, revenues and gross profit attributable to a particular generic product normally *is related to the number of competitors in that product's market, pricing and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. We face competition from other generic drug manufacturers and from brand name companies in the generic market.* Many of these companies seek to participate in sales of generic products by, among other things, collaborating with other generic pharmaceutical companies or by marketing their own generic equivalent to their brand products as "Authorized Generics".

51.     The 2015 10-K also purported to describe the Company's then-present business

strategy, stating, in pertinent part, as follows:

**Business Strategy**

We apply three key strategies to achieve growth for our US Brands, US Medical Aesthetics and International Brands businesses: (i) internal development of

differentiated and high-demand products, (ii) establishment of strategic alliances and collaborations and (iii) acquisition of products and companies that complement our current business.

**Anda Distribution Segment**

*We believe that we are able to effectively compete in the distribution market, and therefore optimize our market share, based on three critical elements: (i) competitive pricing, (ii) high levels of inventory for approximately 13,200 SKUs for responsive customer service that includes, among other things, next day delivery to the entire U.S., and (iii) well-established telemarketing relationships with our customers, supplemented by our electronic ordering capabilities.*

52.     On May 10, 2016, Allergan issued a press release announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016"). For the quarter, Allergan reported net income of $255.70 million, or $0.47 per diluted share, on revenue of $3.80 billion, compared to a net loss of $512 million, or $1.85 per diluted share, on revenue of $2.56 billion for the same period in the prior year. The Q1 2016 release also stated, in pertinent part, as follows:

**Discontinued Operations**

As a result of the proposed divestiture of Allergan's Global Generics business to Teva on July 27, 2015, the financial results of the Company's Global Generics business are being reported as discontinued operations in the condensed consolidated statements of operations. These portions of the Company's results will continue to be reported as discontinued operations until the close of that transaction. Continuing operations includes the U.S. Brands, U.S. Medical, International Brands and Anda Distribution segments. All prior year results have been recast to reflect continuing operations results.

53.     On May 10, 2016, Allergan filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q1 2016 release and reporting in full the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q"). The Q1 2016 10-Q was signed and certified pursuant to SOX by Defendants Saunders and Hilado.

54.     On August 2, 2016, Allergan and Teva announced the completion of Teva's acquisition of the Actavis business from Allergan.

55.     On August 8, 2016, Allergan issued a press release announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016"). For the quarter, Allergan reported a net loss of $501.70 million, or $1.44 per diluted share, on revenue of $3.68 billion, compared to a net loss of $243.10 million, or $0.80 per diluted share, on revenue of $3.63 billion for the same period in the prior year. The Q2 2016 release quoted Defendant Saunders stating, in pertinent part, as follows:

*2016 has been a year of significant, positive transition for Allergan.* On August 2, we announced the completion of the divestiture of our Global Generics business, and on August 3, announced the proposed divestiture of our Anda distribution business, to Teva. *These steps position Allergan as a pure branded focused business able to maximize the power of its therapeutic areas and the promise of its leading Open Science pipeline of 65+ mid-to-late stage development programs.*

56.     The Q2 2016 release also stated, in pertinent part, as follows:

**Discontinued Operations and Continuing Operations**

As a result of the decision to hold for sale our Anda Distribution business as of June 30, 2016, which we subsequently announced we are selling to Teva, and the now completed divestiture of the Company's Global Generics business to Teva on August 2, 2016, the second quarter 2016 financial results of these businesses are being reported as discontinued operations in the condensed consolidated statements of operations.     The Company's Anda Distribution results will be reported as discontinued operations until the close of that transaction. A portion of the third quarter 2016 Global Generics business results will be reported as discontinued operations in Allergan's third quarter 2016 earnings report. Included in segment revenues are product sales that are sold by the Anda Distribution business once the Anda Distribution business has sold the product to a third party customer. These sales are included in segment results and are excluded from total continuing operations revenues through a reduction to Corporate revenues. Cost of sales for these products in discontinued operations is equal to our average third-party cost of sales for third-party brand products distributed by Anda Distribution.

57.     On August 8, 2016, Allergan filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q2 2016 release and

reporting in full the Company's financial and operating results for the quarter ended June 30, 2016

(the "Q2 2016 10-Q"). The Q2 2016 10-Q was signed and certified pursuant to SOX by Defendants

Saunders and Hilado.

58. On November 2, 2016, Allergan issued a press release announcing the Company's

financial and operating results for the quarter ended September 30, 2016 (the "Q3 2016"). For the

quarter, Allergan reported net income of $15.22 billion, or $38.58 per diluted share, on revenue of

$3.62 billion, compared to net income of $5.30 billion, or $13.29 per diluted share, on revenue of

$3.47 billion for the same period in the prior year. The Q3 2016 release also stated, in pertinent part,

as follows:

**Discontinued Operations and Continuing Operations**

As a result of the completed divestiture of the Company's Global Generics business
to Teva on August 2, 2016, and the completed divestiture of the Company's Anda
distribution business to Teva on October 3, 2016, the third quarter 2016 financial
results of these businesses are being reported as discontinued operations in the
condensed consolidated statements of operations. Included in segment revenues are
product sales that were sold by the Anda Distribution business once the Anda
Distribution business had sold the product to a third party customer. These sales are
included in segment results and are excluded from total continuing operations
revenues through a reduction to Corporate revenues. Cost of sales for these products
in discontinued operations is equal to our average third-party cost of sales for third
party brand products distributed by Anda Distribution.

59. On November 4, 2016, Allergan filed a Quarterly Report on Form 10-Q with the

SEC, reiterating the financial and operating results previously announced in the Q3 2016 release and

reporting in full the Company's financial and operating results for the quarter ended September 30,

2016 (the "Q3 2016 10-Q"). The Q3 2016 10-Q was signed and certified pursuant to SOX by

Defendants Saunders and Hilado.

60. The statements referenced above in ¶¶27-34, 36-38, 40-41, 44-53 and 55-59 were

each materially false and misleading when made as they failed to disclose and misrepresented the

following adverse facts which were known to Defendants or recklessly disregarded by them as follows:

    (a)  Allergan's Actavis unit and several of its pharmaceutical industry peers colluded to fix generic drug prices in violation of the federal antitrust laws, causing Allergan to report outsized revenues derived from illegal activities;

    (b)  Allergan's outsized revenue growth was not sustainable but for the illegal activity;

    (c)  Allergan faced the risk of substantial profit disgorgement, fines, penalties and/or legal judgments as a result of the illegal activity; and

    (d)  as a result of the foregoing, the Company was not on track to achieve the financial results Defendants had led the market to expect during the Class Period.

    61.  In its Q2 2015 10-Q, Allergan disclosed for the first time that, "[o]n June 25, 2015, the Company [had] received a subpoena from the U.S. Department of Justice ("DOJ"), Antitrust Division seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."

    62.  On August 6, 2015, *Bloomberg* published a report emphasizing that while several other companies had "made similar disclosures in the past," Allergan was "the biggest company yet to draw scrutiny in the government's widening antitrust probe of the industry."

    63.  On this news, the price of Allergan common stock declined $17.17 per share on August 6, 2015, down approximately 5% from its prior close, on unusually high trading volume of nearly four million shares.

    64.  Thereafter, during the trading day on November 3, 2016, several media outlets reported that by the end of 2016, U.S. prosecutors were likely to file criminal charges against

Allergan and several other pharmaceutical companies for unlawfully colluding to fix generic drug

prices. For example, *Bloomberg's* report entitled "U.S. Charges in Generic-Drug Probe to Be Filed

by Year-End" stated, in pertinent part, as follows:

> U.S. prosecutors are bearing down on generic pharmaceutical companies in a
> sweeping criminal investigation into suspected price collusion, a fresh challenge for
> an industry that's already reeling from public outrage over the spiraling costs of
> some medicines.

> The antitrust investigation by the Justice Department, begun about two years ago,
> now spans more than a dozen companies and about two dozen drugs, according to
> people familiar with the matter. The grand jury probe is examining whether some
> executives agreed with one another to raise prices, and the first charges could emerge
> by the end of the year, they said.

> Though individual companies have made various disclosures about the inquiry, they
> have identified only a handful of drugs under scrutiny, including a heart treatment
> and an antibiotic. Among the drugmakers to have received subpoenas are industry
> giants Mylan NV and Teva Pharmaceutical Industries Ltd. Other companies include
> Actavis, which Teva bought from Allergan Plc in August, Lannett Co., Impax
> Laboratories Inc., Covis Pharma Holdings Sarl, Sun Pharmaceutical Industries Ltd.,
> Mayne Pharma Group Ltd., Endo International Plc's subsidiary Par Pharmaceutical
> Holdings and Taro Pharmaceutical Industries Ltd.

65.    On this news, the price of Allergan common stock plummeted more than $9 per share

on November 3, 2016, or more than 4.5%, on unusually heavy trading of more than 13 million

shares, *erasing more than $56 billion in market capitalization worldwide from the stock's Class*

*Period High*.

66.    The market for Allergan common stock was open, well-developed and efficient at all

relevant times. As a result of these materially false and misleading statements and omissions as set

forth above, Allergan common stock traded at artificially inflated prices during the Class Period.

Plaintiff and other members of the Class purchased or otherwise acquired Allergan common stock

relying upon the integrity of the market price of Allergan common stock and market information

relating to Allergan, and have been damaged thereby.

67.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Allergan common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

68.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Allergan's business, prospects, and operations.  These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of Allergan and its business, prospects, and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing Allergan common stock at artificially inflated prices, thus causing the damages complained of herein.  When the true facts about the Company were revealed to the market, the inflation in the price of Allergan common stock was removed and the price of Allergan common stock declined dramatically, causing losses to Plaintiff and the other members of the Class.

## ADDITIONAL SCIENTER ALLEGATIONS

69.     As alleged herein, Allergan and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or

acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding Allergan, their control over, and/or receipt and/or modification of Allergan's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Allergan, participated in the fraudulent scheme alleged herein.

## NO SAFE HARBOR

70.    The "Safe Harbor" warnings accompanying Allergan' reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. *See* 15 U.S.C. §78u-5(b)(2)(A).

71.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Allergan who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

- 24 -

## APPLICATION OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET

72.    Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    Allergan common stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Allergan common stock; and

(e)    Plaintiff and other members of the Class purchased Allergan common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

73.    At all relevant times, the market for Allergan common stock was efficient for the following reasons, among others:

(a)    As a regulated issuer, Allergan filed periodic public reports with the SEC; and

(b)    Allergan regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## LOSS CAUSATION/ECONOMIC LOSS

74.    During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Allergan common stock and operated as a fraud or deceit on Class Period

- 25 -

purchasers of Allergan common stock by misrepresenting the value of the Company's business and financial prospects. As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Allergan common stock fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of Allergan common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

75.    Plaintiff incorporates ¶¶1-74 by reference.

76.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

77.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Allergan common stock during the Class Period.

78.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Allergan common stock. Plaintiff and the Class would not have purchased Allergan common stock at the prices they paid, or at all, if they had been

aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**COUNT II**

**For Violations of §20(a) of the Exchange Act**
**Against All Individual Defendants**

79.     Plaintiff incorporates ¶¶1-78 by reference.

80.     The Individual Defendants acted as controlling persons of Allergan within the meaning of §20(a) of the Exchange Act. By reason of their positions with the Company, and their ownership of Allergan common stock, the Individual Defendants had the power and authority to cause Allergan to engage in the wrongful conduct complained of herein, and exercised their power to control the activities and direct the actions complained of herein. By reason of such conduct, these defendants are liable pursuant to §20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

- 27 -

D.     Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  January 10, 2017

**KANTROWITZ, GOLDHAMER
& GRAIFMAN, P.C.**

Gary S. Graifman
210 Summit Avenue
Montvale, New Jersey 07645
Tel:     (201) 391-7000
Fax:    (201) 307-1088
*ggraifman@kgglaw.com*

**ABRAHAM, FRUCHTER & TWERSKY, LLP**
Jack G. Fruchter
One Penn Plaza, Suite 2805
New York, New York 10119
Tel:  (212) 279-5050
Fax:  (212) 279-3655
jfruchter@aftlaw.com

*Attorneys for Plaintiff*